ELENA ALBARRAN,
    Plaintiff,

      v.

KEITH BLESSING, et al.,
    Defendants.

No. 3:17-cv-2157 (SRU)

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This is a case about a fatal, single-car accident. Just after 4:00 a.m. on September 3, 2016, Putnam County Sheriff's Deputy Keith Blessing ("Blessing") attempted to pull over a car in which the plaintiff, Elena Albarran ("Albarran"), was traveling. At that time, the car was in Brewster, New York, which is in Putnam County. Albarran was one of five occupants in the car, but she was not driving. The driver did not stop, and, instead, accelerated. A brief police pursuit ensued and carried into neighboring Danbury, Connecticut. The driver of the fleeing car lost control of the vehicle and smashed into a utility pole at an intersection. Albarran and one other passenger survived the accident. Three others—two passengers and the driver—died.

Albarran later sued Putnam County (the "County"), the Putnam County Sheriff's Department (the "Department"), and Blessing (collectively, the "Defendants"). *See* Am. Compl., Doc. No. 36. In her amended complaint, Albarran alleges negligence and reckless disregard for the safety of others against Blessing, and vicarious liability and negligence against the County and the Department.

The Defendants made a motion for summary judgment on the grounds that (1) Blessing is entitled to governmental immunity; (2) even if not, Blessing's actions were not reckless and/or

negligent; and (3) even if Blessing's actions were reckless and/or negligent, they did not proximately cause Albarran's injuries. *See* Mot. Summ. J., Doc. No. 38. On August 6, 2019, I held a hearing on the Defendants' motion for summary judgment and Albarran's motions to strike[1] and for a more definite statement,[2] and I took those motions under advisement. *See* Min. Entry, Doc. No. 54. For the following reasons, the Defendants' motion for summary judgment is **granted**, and Albarran's motions to strike and for a more definite statement are **denied as moot**.[3]

## I.     Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment). When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the

---

[1]  Mot. to Strike, Doc. No. 41.

[2]  Mot. for More Definite Stmnt., Doc. No. 42.

[3]  I am aware that two other cases related to this incident are pending in the Southern District of New York. *See Nunez, et al. v. Kas's Bar & Restaurant LLC, et al.*, Case No. 7:17-cv-9279 (CS); *Garmendia Valenzuela v. Kas's Bar & Restaurant LLC, et al.*, Case No. 7:17-cv-8923 (CS). District Judge Cathy Seibel has indicated that she will rule from the bench on the pending motions for summary judgment in those cases on March 24, 2020.

mere allegations or denials of the pleadings but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," a court may grant summary judgment. *Anderson*, 477 U.S. at 249–50. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Regarding materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. *Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of

nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

## II.    Background

At 4:21:34 a.m. on September 3, 2016, a single-car accident in Danbury killed three people (Raymond Rivera, the car's driver; Nelson Oseguedo, a passenger sitting behind Rivera; and Warner Nunez, a passenger sitting the back middle seat), and seriously injured two others (Albarran, a passenger in the front passenger's seat; and Beatriz Grajales, a passenger sitting behind Albarran). *See* Pl. Rule 56(a)2 Statement of Facts, Att. to Mem. in Opp'n to Mot. Summ. J. ("56(a)2 Stmnt."), Doc. No. 45-2, at ¶¶ 46, 51, 55–57. Grajales testified that none of the passengers in the backseat was wearing a seatbelt. *See* Grajales Depo., Ex. B to Defs.' Mot. Summ. J. ("Grajales Depo."), Doc. No. 38-3, at 60:2–8. The five occupants had left Kas's Bar and Restaurant ("Kas's") in Brewster, New York at roughly 4:00 a.m.; they left together in Grajales's Nissan Maxima (the "Maxima"). *See* 56(a)2 Stmnt., Doc. No. 45-2, at ¶¶ 53–54. Shortly after leaving Kas's, Rivera stopped at a gas station, and he and Oseguedo went inside and purchased at least a case of beer. *See* Grajales Depo., Doc. No. 38-3 at 57:6–58:18.

Rivera was driving the Maxima eastbound along State Route 6 in Brewster, New York headed towards Danbury, Connecticut. 56(a)2 Stmnt., Doc. No. 45-2, at ¶ 3. Around 4:20 a.m., Blessing was driving westbound on Route 6 in a marked police vehicle[4] and noticed that one of the Maxima's headlights was out. *Id*. at ¶¶ 1–2. Blessing performed a U-turn and began following the Maxima. *Id*. at ¶ 4; *see* Dashcam Video, Ex. C to Mot. Summ. J. ("Dashcam Video"), Doc. No. 38-4 (when the video begins, at 4:19:07 a.m., Blessing has already performed

---

[4] Blessing had been assigned to the "midnight patrol" since 2012. In that role, Blessing helped patrol the roads of Putnam County from 11:30 p.m. to 7:30 a.m. *See* Blessing Depo., Ex. A to Mot. Summ. J., Doc. No. 38-2, at 10:4–11:22.

the U-turn). Blessing testified that he then observed the Maxima swerve multiple times and cross the dividing line roughly three times. 56(a)2 Stmnt., Doc. No. 45-2, at ¶ 5; *see* Dashcam Video, Doc. No. 38-4, at 4:19:20–4:19:57 a.m. After following the car for a short period of time, Blessing decided to pull over the Maxima, and so Blessing activated his emergency lights. 56(a)2 Stmnt., Doc. No. 45-2, at ¶ 6; *see also* Dashcam Video, Doc. No. 38-4, at 4:19:57 a.m. Blessing testified that he began following the Maxima because of the broken headlight and that he attempted to pull over the Maxima because he thought the driver might be intoxicated. Blessing Depo., Ex. A to Mot. Summ. J. ("Blessing Depo."), Doc. No. 38-2, at 13:5–14:6, 16:6–15; 48:9–15. Specifically, Blessing believed the driver might be intoxicated both because the Maxima was moving erratically and because it was traveling, at times, almost 20 mph under the speed limit (as low as 36 mph in a 55 mph zone), which Blessing testified is a "telltale sign" of an intoxicated driver. *See id.* at 51:8; Dashcam Video, Doc. No. 38-4, at 4:19:17–4:19:57 a.m.

Even though Blessing activated his emergency lights, Rivera did not pull over. *See* 56(a)2 Stmnt., Doc. No. 45-2, at ¶ 10; Dashcam Video, Doc. No. 38-4. At 4:20:11 a.m., Blessing briefly activated his siren. *See* 56(a)2 Stmnt., Doc. No. 45-2, at ¶ 12; Dashcam Video, Doc. No. 38-4. Instead of pulling over, Rivera began to accelerate. At 4:20:18 a.m., Blessing alerted the Department's dispatcher that he had "a failure to comply." *See* Dashcam Video, Doc. No. 38-4. By 4:20:19 a.m., Blessing's patrol car was moving 51 mph to keep up with Rivera. *See id.* From 4:20:21 to 4:20:28 a.m., Blessing relayed the Maxima's license plate number to the Department's dispatcher. *See id.* At some point, Blessing also communicated his location (approaching the Connecticut State line) and requested that the Department's dispatcher notify the Danbury Police Department (the "DPD") about the Maxima's approach. *See* 56(a)2 Stmnt., Doc. No. 45-2, at ¶ 19. By 4:20:38 a.m., Blessing's patrol car was moving 60 mph to keep up

with Rivera. *See* Dashcam Video, Doc. No. 38-4. Blessing testified that, in his experience, intoxicated drivers pull over when police indicate that they should. *See* Blessing Depo., Doc. No. 38-2, at 58:23–25. When a suspected intoxicated driver does not pull over, Blessing testified, Blessing often suspects that the driver has something to hide, such as a parole or probation violation, or some other kind of criminality (such as harm to another passenger). *See id.* at 24:10–25:7; 58:10–59:5; 77:9–18. Blessing testified that—although unaware when he began to follow the Maxima—he eventually became aware that there were passengers in the Maxima. *See id.* at 12:22–25, 84:18–24.

By 4:20:57 a.m., Blessing's patrol car was moving 71 mph to keep up with the Maxima. *See* Dashcam Video, Doc. No. 38-4. Still, Rivera began to pull away. *See id.* At 4:20:58 a.m., the eastbound side of State Route 6 changed from two lanes to one. *See id.* At 4:21:02 a.m., Blessing radioed to the Department's dispatcher that he was crossing into Connecticut. *See* 56(a)2 Stmnt., Doc. No. 45-2, at ¶ 35. By 4:21:15 a.m., Blessing's patrol car was moving 80 mph to try to keep up with Rivera. *See* Dashcam Video, Doc. No. 38-4. And by 4:21:21 a.m., Blessing's patrol car reached 89 mph—its top speed during the pursuit—to try to keep up. *See id.* Still, the distance between Blessing and Rivera grew larger.

At 4:21:24 a.m., Blessing began decelerating. *See id.* By 4:21:31 a.m., Blessing's patrol car had decelerated to 78 mph, and he had accordingly lost even more ground to Rivera. *See id.* Also at 4:21:31 a.m., Blessing had turned off his siren. *See id.* At that point, Blessing testified that he was more than an eighth of a mile behind Rivera, who was on a straightaway but about to enter a left curve. *See* Blessing Depo., Doc. No. 38-2, at 20:12; Dashcam Video, Doc. No. 38-4. Blessing testified that he ended his pursuit at 4:21:31 a.m. (by turning off his emergency siren and significantly decelerating) because the Maxima was approaching the "Staples Plaza" in

Danbury, which "had a Starbucks" and a "park and ride area." Blessing Depo., Doc. No. 38-2, at 19:6–23. The speed limit around the Danbury "Staples Plaza" was 40 mph. *See* 56(a)2 Stmnt., Doc. No. 45-2, at ¶ 40.

At 4:21:37 a.m., Blessing said to the Department's dispatcher: "He just wrecked." *See* Dashcam Video, Doc. No. 38-4. By that time—just six seconds after Blessing testified that he had terminated his pursuit—Blessing's patrol car had decelerated to 68 mph, and he had lost still more ground to Rivera. *See id.* At the time of the crash, Blessing had not deactivated his emergency lights or alerted the Department's dispatcher that he was terminating the pursuit. 56(a)2 Stmnt., Doc. No. 45-2, at ¶ 47. Blessing testified that he did not do those things because there was such a short period of time between terminating his pursuit (turning off his siren and decelerating at 4:21:31 a.m.) and the crash (sometime around 4:21:34 a.m.).[5] *See* Blessing Depo., Doc. No. 38-2, at 62:2–63:18. When Blessing observed the accident, he testified that he had the duty to render aid, and doing so became his focus. *See id.* Albarran and Grajales were taken to Danbury Hospital for treatment of their injuries, and the three remaining occupants were pronounced dead at the scene. Incident Report, Ex. D to Mot. Summ. J. ("Incident Report"), Doc. No. 38-5, at DPD0003.

During the pursuit—between about 4:19:57 and 4:21:31 a.m.—the passengers inside the Maxima had been pleading with Rivera to pull over and stop the car. *See* 56(a)2 Stmnt., Doc. No. 45-2, at ¶¶ 29, 32 (citing deposition testimony from Grajales and Albarran). Although Rivera initially did not respond to the passengers' pleas, Rivera eventually replied that he would

---

[5] The Defendants erroneously note that the accident occurred at approximately 4:20:34 a.m., rather than 4:21:34 a.m. *See* Defs.' 56(a)1 Statement of Facts ("56(a)1 Stmnt."), Doc. No. 38-13, at ¶ 46. Albarran correctly characterizes that discrepancy as a typographical error. *See* 56(a)2 Stmnt., Doc. No. 45-2, at ¶ 46; 56(a)1 Stmnt., Doc. No. 38-13, at ¶ 42 (stating that Blessing decided to terminate the pursuit at 4:21:31 a.m., which occurred before the accident); *see also* Dashcam Video, Doc. No. 38-4 (footage showing the crash occurring at roughly 4:21:34 a.m.).

not stop. *See id.* at ¶¶ 30, 33. Rivera was indeed on parole at the time of the accident: He had

been paroled in August 2016 after serving seven years in prison. *See id.* at ¶ 80. According to

Grajales, just days before the accident, Rivera had said to her that he would rather die than go

back to prison. *See* Incident Report, Doc. No. 38-5, at DPD0007. An autopsy revealed that at

the time of the accident, Rivera's blood alcohol content was .16 percent, which is twice the legal

limit in both Connecticut and New York. 56(a)2 Stmnt., Doc. No. 45-2, at ¶¶ 82–84.

After the accident, the DPD, led by Sergeant Rory DeRocco ("DeRocco"), conducted a

reconstruction of the accident. *Id.* at ¶¶ 60–61. DeRocco has been doing accident reconstruction

with the DPD in various capacities since 1988. *See* DeRocco Depo., Ex. H to Defs.' Mot.

Summ. J., Doc. No. 38-9, at 8:11–10:19. In connection with the investigation, an auto repair

shop examined the Maxima. The examiners determined that the Maxima's front tires were

bald—they had tread that measured below the manufacturer's specifications—and that the rear

tires were a different size than the front tires, which difference was also contrary to the

manufacturer's specifications. 56(a)2 Stmnt., Doc. No. 45-2, at ¶¶ 69–70. DeRocco also found

that the "moisture of the road surface, the painted double yellow lines, and the mismatched worn

tires" led to a reduced coefficient of friction between the Maxima's tires and the road. Incident

Report, Doc. No. 38-5, at DPD0006. DeRocco ultimately concluded that Rivera was at fault for

the accident because Rivera was out past his parole curfew, his blood alcohol level was above

the legal limit, he recklessly drove above the speed limit, he disobeyed traffic control devices, he

refused to pull over, and he ignored his passengers' pleas to pull over. 56(a)2 Stmnt., Doc. No.

45-2, at ¶¶ 85–86 (Albarran admits that DeRocco made those conclusions but objects insofar as

those are ultimate issues in the case). Further, DeRocco determined that Rivera entered a left

curve on State Route 6 and "attempt[ed] to cut the curve from inside . . . to outside," which

"reduce[d] the radius of the curve making it sharper" and "reduc[ed] the ability for the vehicle to complete the turn successfully." Incident Report, Doc. No. 38-5, at DPD0006.

Albarran initiated this action in Connecticut state court on December 1, 2017, and the Defendants removed the case to this court on December 27, 2017. *See* Notice of Removal, Doc. No. 2. The Defendants sought to transfer the case to the Southern District of New York—where, as described above, two similar cases are pending—but I denied that motion and a motion to reconsider my ruling. *See* Mot. to Transfer, Doc. No. 9; Order on Mot. to Transfer, Doc. No. 11; Mot. for Reconsid., Doc. No. 20; Order on Mot. for Reconsid., Doc. No. 30.

Albarran filed an amended complaint on May 14, 2019 in which she alleges negligence (count one) and reckless disregard for the safety of others (count two) against Blessing; vicarious liability against the County and the Department for Blessing's negligence (count three) and recklessness (count four); and negligence against the County and the Department (count five). *See* Am. Compl., Doc. No. 36. In general, Albarran argues that Blessing was negligent because he:

- operated his vehicle in excess of the posted speed limit in a manner that endangered the lives of the passengers, including Albarran;
- operated his vehicle at an unreasonable, improper, and excessive speed for the road conditions;
- conducted the pursuit in a manner that violated Connecticut and New York law and the Department's policies; and
- continued a high-speed pursuit even though he suspected that Rivera was intoxicated, which created a substantial and unjustifiable risk of harm to the passengers.

*See id.* at ¶ 15. Albarran asserts that she and the other passengers were "victims identifiable to . . . Blessing and he knew, or should have known, that conducting and/or continuing the high-speed pursuit in the manner in which he did and under the circumstances then existing exposed said passengers to a risk of imminent harm." *Id.* at ¶ 16.

The Defendants argue that they are "entitled to summary judgment on the negligence claims under both Connecticut and New York law based upon the statutory immunities provided for emergency responders and because Blessing did not violate any duty of care to [Albarran], nor did he proximately cause the accident."  Mem. in Supp. Mot. Summ. J. ("Mem. in Supp."), Doc. No. 38-14, at 1 (internal page number).  Albarran argues that the Defendants are not entitled to summary judgment because Blessing is not shielded by governmental immunity, and, further, Blessing proximately caused the accident.  Mem. in Opp'n to Mot. Summ. J. ("Mem. in Opp'n"), Doc. No. 45-1.

## III.  Discussion

First, I explain why Connecticut's laws apply to this dispute.  Second, I discuss whether Blessing is entitled to governmental immunity and conclude that he is.  A case pending now before the Connecticut Supreme Court considers a highly similar issue, and I do not know if the Supreme Court will analyze the question the same way.  However, as I explain, I would reach the same result in this case even if the Supreme Court disagrees with my immunity analysis.  That is because, even assuming that Blessing is *not* entitled to governmental immunity, I conclude that no rational juror could find that Blessing breached the duty of care that he owed to Albarran.

### A.  Choice of Law

The pursuit in this case began in Brewster, New York and crossed into Danbury, Connecticut, where the Maxima crashed.  The Defendants argue that New York law should govern the events that occurred in New York, and Connecticut law should govern the events that occurred in Connecticut.  *See* Mem. in Supp., Doc. No. 38-14, at 6–7.  Albarran argues that Connecticut law should apply because she is a resident of—and sought medical treatment in—

Connecticut, and much of the pursuit (and the crash) occurred in Connecticut. Mem. in Opp'n, Doc. No. 45-1, at 7–8.

District courts sitting in diversity apply the forum state's conflict of laws rules. *See Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 141 (2d Cir. 2015) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). In tort actions, Connecticut courts apply the "most significant relationship" test set out in sections 6 and 145 of the Restatement (Second) of Conflict of Laws. *See Jaiguay v. Vasquez*, 287 Conn. 323, 348–50 (2008); *Western Dermatology Consultants, P.C. v. VitalWorks, Inc.*, 322 Conn. 541, 551 n.9 (2016). In the absence of a state statutory directive indicating otherwise, Section 6(2) of the Restatement (Second) of Conflict of Laws lists factors a court should consider in determining which jurisdiction has the most significant relationship with the action at issue:

- the needs of the interstate and international systems;
- the relevant policies of the forum;
- the relevant policies of the other interested states and the relative interests of those states in the determination of the particular issue;
- the protection of justified expectations;
- the basic policies underlying the particular field of law;
- certainty, predictability and uniformity of result; and
- ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2); *see also Jaiguay*, 287 Conn. at 351. Section 145(2) adds the following considerations, which are applicable in tort actions:

- the place where the injury occurred;
- the place where the conduct causing the injury occurred;
- the domicile, residence, nationality, place of incorporation and place of business of the parties; and
- the place where the relationship between the parties is centered.

Restatement (Second) of Conflict of Laws § 145(2); *see also Jaiguay*, 287 Conn. at 352. "It is the significance, and not the number of [section] 145(2) contacts that determines the outcome of

the choice of law inquiry[.]" *Western Dermatology*, 322 Conn. at 560 (internal quotation marks and citations omitted).

I will not—as the Defendants ask—apply the law of New York to the parts of the pursuit that occurred in New York and apply the law of Connecticut to the parts of the pursuit that occurred in Connecticut. *See* Mem. in Supp., Doc. No. 38-14, at 7. The Defendants cite no authority supporting such an approach, and I am aware of none. Further, Connecticut has specifically moved away from an exclusive focus on the locus of injury; more generally, that departure indicates that courts should not choose applicable law in a tort case by relying blindly on geography. *See Western Dermatology*, 322 Conn. at 551 n.9.

Although it is a relatively close question, I hold that Connecticut law applies in this case. Connecticut is the place of injury, and much of the high-speed pursuit took place in Connecticut. Albarran is domiciled in Connecticut, and she obtained medical care in Connecticut. Connecticut has a weighty interest in ensuring that potential tort victims are compensated. *See Lodge v. Arett Sales Corp.*, 246 Conn. 563, 578–79 (1998) (explaining that compensation of victims is one of the major goals of tort law). And, because the crash and most of the high-speed pursuit occurred in Connecticut, it is not clear that any negligence or harm occurred in New York.

Still, it is true that some of the important, relevant conduct took place in New York. For instance, Rivera had been drinking in New York; he began driving in New York; Blessing first spotted Rivera and started following him in New York; Rivera initially failed to pull over in New York; and Blessing decided to engage in pursuit in New York. Further, the Defendants are all domiciled in New York. *See* Notice of Removal, Doc. No. 2, at 1. Blessing no doubt has an expectation that, in his role as a Putnam County police officer, he is subject to New York laws.

However, by asking the Department's dispatcher to contact the DPD and, later, terminating his pursuit, Blessing clearly understood that his official conduct in Connecticut might be limited differently than his conduct in New York. New York, too, surely has an interest in ensuring that police officers in New York counties are not exposed to more liability for torts that take place just across the Connecticut border than they otherwise would be if the same tort took place on the New York side of the border.

New York's concern in protecting its municipal officers would ordinarily weigh heavily in favor of applying New York law, but in this instance it is essentially moot. In both New York and Connecticut, pursuing police officers are not subject to liability if they act merely negligently when performing a discretionary duty. That is because, as described above, in New York, "a police officer's conduct in pursuing a suspected lawbreaker may not form the basis of civil liability . . . unless the officer acted in reckless disregard for the safety of others." *Saarinen v. Kerr*, 84 N.Y.2d 494, 501 (1994) (discussing N.Y. Veh. & Traf. Law § 1104(e)). Thus, a pursuing police officer in New York is not subject to civil liability if he or she acted with less than "reckless disregard," *i.e.*, negligently. Similarly, in Connecticut, as described more fully below, municipal officers are not liable for their negligent acts when performing a discretionary function. *See* Conn. Gen. Stat. § 52-557n(a)(2)(B). Because I hold below that Blessing was performing a discretionary function when he pursued the Maxima, Blessing was not subject to civil liability for his (alleged) negligence during that pursuit. Thus, at least with respect to this case, the standards in New York and Connecticut are equivalent. Accordingly, Connecticut's interests outweigh New York's in this case.

B.  Connecticut Law

"To establish a claim of negligence, a plaintiff must demonstrate that the defendant was under a duty of care, that the defendant's conduct breached that duty, and that the breach caused an actual injury to the plaintiff."  *Brooks v. Powers*, 328 Conn. 256, 272 (2018).  In this case, the first question is whether Blessing is entitled to governmental immunity as a matter of law.  *See Ventura v. Town of East Haven*, 330 Conn. 613, 636 (2019).  If Blessing is not immune from liability, the next question is whether a genuine issue of material fact exists regarding whether Blessing breached his duty of care with respect to Albarran.

1.  *Governmental Immunity*

In Connecticut, municipalities and municipal officials are immune from liability "for damages to person or property caused by . . . negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law."  Conn. Gen. Stat. § 52-557n(a)(2)(B); *see also Ventura*, 330 Conn. at 629–30. That immunity is called "discretionary act immunity."  "In contrast, municipal officers are not immune from liability for negligence arising out of their ministerial acts, defined as acts to be performed in a prescribed manner without the exercise of judgment or discretion."  *Ventura*, 330 Conn. at 630 (internal citations and quotation marks omitted).  Determining whether discretionary act immunity applies is a question of law for the court.  *See id.* at 633–35.

a.  Blessing is Entitled to Discretionary Act Immunity.

The Defendants argue that Blessing is entitled to discretionary act immunity because his duties in an emergency pursuit are discretionary, not ministerial.  *See* Mem. in Supp., Doc. No. 38-14, at 11.  Connecticut courts have analyzed the question whether discretionary act immunity applies to police pursuits in two parts: (1) whether the decision to *engage* in a pursuit is

discretionary; and (2) whether the *resulting conduct* during the pursuit is discretionary. *See Dudley v. City of Hartford*, 2013 WL 4056715, at *5–6 (Conn. Super. July 24, 2013); *Vilton v. Burns*, 2004 WL 1615850, at *7–9 (Conn. Super. June 22, 2004). Courts have consistently held that the decision to engage in a pursuit is discretionary. *See Vilton*, 2004 WL 1615850, at *7; *Dudley*, 2013 WL 4056715, at *5–6; *Docchio v. Bender*, 2002 WL 31050688, at *3–4 (Conn. Super. Aug. 15, 2002). Indeed, Albarran does not argue otherwise. *See* Mem. in Opp'n, Doc. No. 45-1, at 14–15.

The second question, however, is not so clear and is currently pending before the Connecticut Supreme Court.[6] Lower Connecticut courts are split regarding whether an officer's actions *during* pursuit are also discretionary, but the trend in more recent caselaw suggests that they are. In the past, Connecticut courts sometimes held that an officer's actions during pursuit arose from ministerial duties and, therefore, were not subject to governmental immunity. *See, e.g.*, *Vilton*, 2004 WL 1615850, at *10 (concurring with line of cases "that the duty of a police officer to operate a police cruiser with due care and so as not to endanger the safety of others is a ministerial duty outside the ambit of governmental immunity"); *Dempsey v. Rinehart*, 2009 WL 5511553 at *5 (Conn. Super. Dec. 18, 2009); *Docchio*, 2002 WL 31050688, at *4; *Nunez v. VPSI, Inc.*, 2001 WL 236755, at *3 (Conn. Super. Feb. 20, 2001); *Boone v. Mills*, 1990 WL 283770, at *1–2 (Conn. Super. Oct. 17, 1990). More recently, courts have often held that an officer's conduct during a police pursuit involves discretion and, more generally, have emphasized that officers' duties may be discretionary when an officer is required to balance various criteria in a given situation. *See Parker v. Stadalink*, 2016 WL 2935567, at *5 (Conn.

---

[6] *Angela Borelli, Administratrix of the Estate of Brandon Giordano v. Officer Anthony Renaldi, et al.*, SC 20232, was argued to the Connecticut Supreme Court on April 29, 2019, but no decision has yet been issued.

Super. May 4, 2016); *Dudley*, 2013 WL 4056715, at *6; *Coley v. City of Hartford*, 140 Conn. App. 315, 326 n.10 (2013); *Faulkner v. Daddona*, 142 Conn. App. 113, 122–23 (2013).

In *Borelli v. Renaldi*, a case now pending before the Connecticut Supreme Court, the trial court granted the defendant officer's motion for summary judgment because the defendant's police pursuit of the decedent's vehicle "inherently involve[d] the exercise of judgment and discretion." 2017 WL 5164609, at *5 (Conn. Super. Sept. 26. 2017). The *Borelli* court opined that Conn. Gen. Stat § 14-283 and the particular municipal police pursuit policy at issue "both require a police officer operating an emergency vehicle to exercise due care for the safety of the general public" and "reaffirm[] the officer's duty to exercise his judgment and discretion in a reasonable and rational manner under the circumstances." *Id.*

I conclude that Blessing's actions during his pursuit of the Maxima were discretionary, and Blessing is therefore entitled to governmental immunity. In my view, the duty to drive with "due regard" for the safety of all persons and property, *see* Conn. Gen. Stat. § 14-283(d), necessarily requires the exercise of judgment, which is the "hallmark" of a discretionary duty. *See Violano v. Fernandez*, 280 Conn. 310, 318 (2006). Thus, I agree with the more modern trend in Connecticut's lower courts. *See, e.g.*, *Borelli*, 2017 WL 5164609, at *5; *Parker*, 2016 WL 2935567, at *5–6. Similarly, the plain language of the Department's police pursuit policy indicates that most of an officer's conduct during a pursuit is discretionary. Admittedly, the Department's police pursuit policy appears to impose some ministerial duties by calling for the officer to act in a prescribed manner.[7] (However, there is no genuine issue of material fact suggesting that Blessing failed to perform one of those ministerial acts; even if there were one,

---

[7] *See* Department Pursuit Policy, Ex. J to Defs.' Mot. Summ. J., Doc. No. 38-11, at ¶ 16.4(A)(4) (instructing that, when an officer decides to pursue, the officer must "[u]se all emergency lights and the siren," "[t]ry to get a physical description of the driver and the vehicle," and "[n]otify the desk member of the situation and keep him informed of your location, direction of travel and all other pertinent information").

no facts suggest that Blessing's failure to perform that ministerial act legally caused the Maxima to crash.[8])

Despite the existence of *some* ministerial duties in the Department's police pursuit policy, the policy clearly indicates that an officer's overriding duties during a pursuit are discretionary. The policy instructs the officer to "[c]ontinually *re-evaluate* the risks of continuing the pursuit." Department Pursuit Policy, Ex. J to Defs.' Mot. Summ. J., Doc. No. 38-11, at ¶ 16.4(A)(5)(b) (emphasis added). The policy further instructs: "If at some point you *consider* the danger to be unacceptable, terminate the pursuit." *Id.* at ¶ 16.4(A)(5)(b)(i) (emphasis added). The officer must "[d]rive at speeds which *take into consideration* the road, weather, conditions and population density." *Id.* at ¶ 16.4(B)(3) (emphasis added). Finally, the policy instructs that an officer should "not hesitate to end a pursuit if the risk *outweighs* the apprehension." *Id.* at ¶ 16.4(B)(5). Those instructions make clear that Blessing was required to exercise his judgment during the pursuit. For all those reasons, I hold Blessing is entitled to discretionary act immunity for his actions during the high-speed chase.

### b. Identifiable Person, Imminent Harm Exception

Under Connecticut law, there is a relevant exception to discretionary act immunity: the identifiable person, imminent harm exception. *See Brooks*, 328 Conn. at 265. The exception,

---

[8] The Dashcam Video indicates the following. Blessing turned on his emergency lights at 4:19:57 a.m., when his cruiser was going 40 mph. The emergency lights remained on at all relevant times. Blessing sounded his cruiser's siren briefly at 4:20:11 a.m., when his cruiser was going 42 mph. Blessing next sounded his siren briefly at 4:20:34 a.m., when his cruiser was going 56 mph. At 4:20:37 a.m., Blessing activated his siren; at that time, his cruiser was going 60 mph. Blessing's siren remained on until 4:21:31 a.m. Finally, Blessing was repeatedly in contact with the Department's dispatcher about the Maxima's license plate, his location, and, generally, what was transpiring.

Even if, as Albarran argues, Blessing was still "in pursuit" at 4:21:31 a.m. and so was required to have his siren on, it is pure speculation that Blessing's decision to turn off his siren at that point legally caused the Maxima to crash. Albarran's expert's suggestion that somehow Blessing's turning off his siren at 4:21:31 a.m. "likely caused the operator of the Maxima to become distracted as he was negotiating the curve in the road" is nothing more than conjecture and does not create a genuine issue of material fact regarding causation. *See* Mem. in Opp'n, Doc. No. 45-1, at 16.

which the Connecticut Supreme Court has "characterized as 'very limited[,]' . . . applies when the circumstances make it apparent to the [municipal] officer that his or her failure to act would be likely to subject an identifiable person to imminent harm." *Id.* at 266 (quoting *Strycharz v. Cady*, 323 Conn. 548, 573 (2016), *abrogated on other grounds by Ventura*, 330 Conn. at 632–33). The exception has three requirements, all of which must be satisfied: "(1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm." *Strycharz*, 323 Conn. at 573–74. "[T]he proper standard for determining whether a harm was imminent is whether it was apparent to the [officer] that the dangerous condition was so likely to cause harm that the [officer] had a clear and unequivocal duty to act immediately to prevent the harm." *Haynes v. Middletown*, 314 Conn. 303, 322–23 (2014). The imminence of harm in a particular situation depends on the "factual circumstances" of that situation. *Brooks*, 328 Conn. at 275. The identifiable person, imminent harm exception "has received very limited recognition in this state." *Violano*, 280 Conn. at 329 (quoting *Evon v. Andrews*, 211 Conn. 501, 507 (1989)).

I hold that the identifiable person, imminent harm exception does not apply here because, as a matter of law, (1) the nature of Blessing's duty to respond to "imminent harm" was unclear, and (2) it was not apparent to Blessing that his conduct was likely to subject Albarran to harm. (I assume without deciding that Albarran was an "identifiable victim" because Blessing testified that, at some point, he became aware that there were passengers in the Maxima. *See* Blessing Depo., Doc. No. 38-2, at 84:18–24.[9])

---

[9] In contrast, the trial court in *Borelli* found that the passenger in that case was not an "identifiable victim" in large part because there was no evidence that the pursuing defendant officer knew of or saw the passenger. *See Borelli*, 2017 WL 5164609, at *8.

Albarran has identified just one case in which a Connecticut court has applied the "very limited" identifiable person, imminent harm exception, and that case is distinguishable.[10] In *Sestito v. City of Groton*, the Connecticut Supreme Court reversed a trial court's decision to award a directed verdict to the defendant officer on plaintiff's negligence claim. 178 Conn. 520, 529 (1979). The defendant officer had observed the onset of a major altercation outside a bar at 1 a.m., and the officer "believed that one member of the group might be armed and a robbery suspect." *Id.* at 523. Still, the officer drove by the group twice and parked in a lot across the street, even as "loud arguing and shoving was occurring" and the group began "scuffling and punching." *Id.* In the melee, an individual was shot and killed. *Id.* Under those circumstances, the Connecticut Supreme Court explained that plaintiff's negligence claim should have made it to the jury. *Id.* at 527.

This case is dissimilar to *Sestito*. In *Sestito*, the defendant officer observed a major melee and knew that at least one participant may have been armed and dangerous. *Sestito*, 178 Conn. at 523. The nature of the duty that arose was clear: to intervene and attempt to halt the melee so that one of the participants—or an innocent bystander—did not get injured. In contrast, the nature of the duty that arose in this case was entirely unclear. Blessing testified that when the Maxima began speeding away—attempting to evade capture—he became worried that this was not a typical drunk driving case; specifically, Blessing suspected "a parole violation, probation violation[,] or harm being done to one of the occupants." *See* Blessing Depo., Doc. No. 38-2, at 77:11–18. Of course, simply by virtue of operating a motor vehicle when drunk, any drunk driver also poses a threat to him or herself and the other passengers in the car. Blessing believed

---
[10] Several Connecticut appellate courts have recently remarked on the narrow applicability of the identifiable victim, imminent harm exception. *See Merritt v. Town of Bethel Police Dep't.*, 120 Conn. App. 806, 815 (2010); *Grady v. Town of Somers*, 294 Conn. 324, 353 (2009).

that the Maxima's passengers were at threat of imminent harm from Rivera's continued operation of the Maxima. But what should Blessing have done to stop the car? Whereas in *Sestito*, what the defendant officer should have done was obvious—break up the melee—here, there was no obvious way for Blessing to stop the Maxima and ensure the safety of all the occupants. Blessing chose to pursue the Maxima for a short time himself and to inform the Department (and the DPD) of the situation. It cannot have been apparent to Blessing that that course of conduct was any more likely to cause Albarran harm than, for instance, falling back and allowing Rivera to speed through the night at 100 mph. The uncertainty of the nature of the duty that arose in this case displays the inapplicability of the identifiable victim, imminent harm exception.

Albarran also points to *Parker v. Stadalink* for support. In *Parker*, the trial court held that there was a genuine issue of material fact regarding whether the identifiable victim, imminent harm exception applied when the defendant officer, assisting in a police pursuit, struck the plaintiff's vehicle—which was "apparently visible" to the officer—while it was stopped at a red light. *See Parker*, 2016 WL 2935567, at *8. However, *Parker* is clearly distinguishable from this case. In *Parker*, it might have been apparent to the defendant officer that his conduct would cause the plaintiff harm because the officer saw the plaintiff's stationary vehicle; in this case it cannot have been apparent to Blessing that his conduct—or his alternative course of conduct of slowing down—would risk harming Albarran. In fact, Blessing undertook his actions, in part, to try to *help* Albarran. *See* Blessing Depo., Doc. No. 38-2, at 77:11–18.

Finally, Albarran's argument cannot be correct because it would create perverse incentives. Police officers would shed governmental immunity by pursuing a speeding car thought to be driven by a drunk motorist if the officer saw a passenger in the car. Such a rule

would run counter to fundamental law enforcement goals because it would more easily enable drunk and dangerous motorists to evade capture.

For the foregoing reasons, I hold that Blessing is entitled to governmental immunity on Albarran's negligence claim. Thus, Blessing is not liable for negligence. However, even if the foregoing analysis becomes infirm because of the Connecticut Supreme Court's anticipated ruling in *Borelli*, I would reach the same result because Blessing did not breach the duty of care that he owed to Albarran, as I explain below.

### 2. *Breach*

The parties agree that the applicable standard of care under Connecticut law required Blessing—as an operator of an emergency vehicle—to "drive with due regard for the safety of all persons and property." Conn. Gen. Stat. § 14-283(d). Normally, the determination whether a defendant has breached the applicable standard of care is a fact-intensive question best reserved for a jury. *See RK Constructors, Inc. v. Fusco Corp.*, 231 Conn. 381, 384 (1994) (citing *Petriello v. Kalman*, 215 Conn. 377, 382–83 (1990)). However, "in any case in which the jury may not reasonably come to a different conclusion," it is the function of the court to determine "whether the defendant has conformed" to the relevant standard of care. *See* Restatement (Second) of Torts §§ 328B(d). That is, "[w]here it is clear upon the evidence that the defendant has or has not conformed to what the standard of the law requires, and that no reasonable man could reach a contrary conclusion, the court must withdraw the issue from the jury." Restatement (Second) of Torts § 328B cmt. g. The question is whether—drawing all reasonable inferences in favor of Albarran—a reasonable juror could conclude that Blessing breached the applicable standard of care. I hold that no reasonable juror could so find.

No reasonable juror could conclude that Blessing did not drive with due regard for the safety of all persons and property.  Recall that Albarran argues that Blessing was negligent because he:

- operated his vehicle in excess of the posted speed limit in a manner that endangered the lives of the passengers, including Albarran;
- operated his vehicle at an unreasonable, improper, and excessive speed for the road conditions;
- conducted the pursuit in a manner that violated Connecticut law[11] and the Department's policies; and
- continued a high-speed pursuit even though he suspected that Rivera was intoxicated, which created a substantial and unjustifiable risk of harm to the passengers.

Am. Compl., Doc. No. 36, at ¶ 15.  Further, Albarran claims that Blessing was "effectively causing the Maxima to go faster" by "chasing 3-5 car lengths behind" it.  Mem. in Opp'n, Doc. No. 45-1, at 16.  Albarran asserts that Blessing's turning off his siren at 4:21:31 a.m. "likely caused the operator of the Maxima to become distracted as he was negotiating the curve in the road" and so caused the crash at 4:21:34 a.m.  *See id.*

The Dashcam Video from Blessing's cruiser tells the story of this case, and any rational juror viewing it would necessarily reach the conclusion that Blessing conducted himself with due regard for the safety of all persons and property during the entirety of his pursuit.  *See* Dashcam Video, Doc. No. 38-4.  Blessing saw the Maxima traveling towards him on the opposite side of State Route 6 and made a U-turn to begin following it because of a broken headlight.  Blessing's Dashcam Video begins just after he has made his U-turn, at 4:19:06 a.m.  Blessing then follows the Maxima for approximately 50 seconds before turning on his emergency lights at 4:19:57 a.m.

---

[11] Specifically, under Connecticut law "the pursuing vehicle shall activate appropriate warning equipment" and that "[a]n audible warning device [i.e., a siren] shall be used during all such pursuits."  Conn. Agencies Regs. § 14-283a-4(b)(2).  Further, under Connecticut law a pursuing officer "shall continually re-evaluate and assess the pursuit situation, including all of the initiating factors, and terminate the pursuit whenever he or she reasonably believes that the risks associated with continued pursuit are greater than the public safety benefit of making an immediate apprehension."  Conn. Agencies Regs. § 14-283a-4(e)(1).

During those 50 seconds, the Maxima travels very slowly (at times 36 mph in a 55 mph zone),

veers from the extreme right of its lane to the extreme left, and crosses the lane dividing line on

at least two occasions. Blessing never gets closer than three car lengths behind the Maxima. No

other cars are on the road on the east or westbound sides of State Route 6. The road is straight.

Blessing testified that he knew this road extremely well and knew that in between the area where

he began following the Maxima and the area where the Maxima crashed, just two side streets

intersected State Route 6. *See* Blessing Depo., Doc. No. 38-2, at 14:7–15:19; *see also* Incident

Report, Doc. No. 38-5, at DPD0026.

At 4:19:57 a.m., Blessing turns on his emergency lights. The Maxima crosses the middle

dividing line again at around 4:20:09 a.m. At 4:20:12 a.m., Blessing uses his siren. He is still

following the Maxima from between three and five car lengths back. Blessing then calls in the

Maxima's license plate number and reports that he has a failure to comply. Blessing knew that

the Maxima was approaching Connecticut, and, in particular, that just over the New York-

Connecticut border was a business district in Danbury, which had "a park and ride as well as

entry and exit ramps to I-84," and which also had a lower speed limit of 40 mph. *See* Blessing

Aff., Ex. J to Defs.' Mot. Summ. J., Doc. No. 38-12, at ¶¶ 8–10. Thus, Blessing told the

Department's dispatcher to contact the DPD to pass off the pursuit to them.

The Maxima keeps speeding up. By 4:20:57 a.m., Blessing is going 71 mph just to keep

up, but the Maxima is pulling away. Blessing testified that when a suspected intoxicated driver

does not pull over, he often suspects that that driver has something to hide, such as a parole or

probation violation, or some other kind of criminality (such as harm to another passenger). *See*

Blessing Depo., Doc. No. 38-2, at 24:10–25:7; 58:10–59:5; 77:9–18. (Blessing was correct—

Rivera was on parole. *See* 56(a)2 Stmnt., Doc. No. 45-2, at ¶ 80.) By this point, the occupants

of the Maxima were all begging Rivera to pull over, but he would not.  *See* 56(a)2 Stmnt., Doc.

No. 45-2, at ¶¶ 29, 32.  From 4:21:01 to 4:21:21 a.m., as Blessing increases his speed up to 89

mph (his top speed), the Maxima unmistakably pulls away from Blessing.  From 4:21:24 to

4:21:31 a.m., Blessing decelerates to 79 mph, and then he turns off his siren.  The Maxima is still

within his sight, but he is, clearly, no longer pursuing the Maxima.  At 4:21:38 a.m., when

Blessing has decelerated to 63 mph, Blessing says: "He just wrecked."  At 4:21:50 a.m., Blessing

arrives at the scene of the crash, and shortly thereafter Blessing gets out of his cruiser and

approaches the mangled Maxima.  Blessing's emergency lights remain on throughout.

 Anyone watching the Dashcam Video would necessarily conclude that Blessing did not

act negligently.  Blessing acted with due regard for the safety of all persons and property, and, to

the extent that Blessing did not follow police procedure to the letter, it is pure speculation that

those lapses caused the crash.  Although Blessing reached speeds of 89 mph in a 55 mph zone,

the Maxima was going *faster than that*, as the Dashcam Video makes clear.  Further, Blessing

was at all times in control of his car.  In the entirety of the pursuit, Blessing and the Maxima pass

not one other car or person.  Blessing testified that he knew this part of State Route 6 was a

sparsely populated straightaway.  Further, Blessing plainly did not intend to keep up with the

Maxima at all costs.  At 4:20:20 a.m., Blessing called the Maxima's plate number into the

Department's dispatcher and asked the dispatcher to alert the DPD.  At that time, Blessing's car

was going 49 mph and keeping up with the Maxima; in other words, both cars were traveling

under the speed limit.

 Albarran proffers an expert report to suggest that somehow Blessing's turning off the

siren at 4:21:31 a.m. "likely caused the operator of the Maxima to become distracted as he was

negotiating the curve in the road."  *See* Pl.'s Add'l Material Facts, 56(a)2(ii) Stmnt., Doc. No.

45-2, at ¶ 20; Mem. in Opp'n, Doc. No. 45-1, at 16 (citing Alpert Aff., Ex. 4 to Arons Decl.,

Doc. No. 45-7 ("Alpert Aff."), at ¶ 47).[12]  Along the same lines, Albarran argues that Blessing

did not actually terminate his pursuit at 4:21:31 a.m. because doing so would have required him,

pursuant to the Department's police pursuit policy, to turn off his emergency lights and to radio

the Department's dispatcher.  *See* Mem. in Opp'n, Doc. No. 45-1, at 13.  Both arguments fail.

First, Albarran's expert's statement is pure conjecture—it is even couched in the language of

possibility ("likely")—and does not establish a genuine issue of material fact.  Second, no

reasonable juror could conclude that Blessing's failure to turn off his emergency lights and to

radio dispatch between 4:21:31 a.m. (when Blessing turned off the siren) and 4:21:34 a.m. (time

of crash) constituted a breach of his ministerial duty to terminate pursuit.  Blessing failed to do

those things because his attention immediately turned to responding to the Maxima's fatal crash.

*See* Blessing Depo., Doc. No. 38-2, at 62:18–20 (noting that he "did not have a chance to

deactivate lights and notify dispatch all in one"); *id.* at 63:14–23 (explaining that he came under

a "duty to act and render emergency aid," which he did); *id.* at 32:6–34:4.  Even if a rational

juror *could* conclude that Blessing had breached his ministerial duty to terminate pursuit in a

particular way, that breach is irrelevant because no facts suggest that those breaches in any way

caused the Maxima's accident.

Finally, Albarran's expert opines that "Blessing following the Maxima at 3-5 car lengths .

. . likely caused the Maxima to go faster to avoid capture."  Alpert Aff., Doc. No. 45-7, at ¶ 56.

Again, that statement is pure conjecture and does not create a genuine issue of material fact.

However, even taking the assertion's premise as true, it *still* does not create a genuine issue of

material fact.  All high-speed vehicle pursuits will involve two (or more) vehicles whose speeds

---

[12]  Paragraphs 45 through 55 of Alpert's affidavit were apparently not submitted.  Thus, I take as true Albarran's
representation of paragraph 47's contents.

are, in part, caused by the speed and manner of the other. However, Connecticut law expressly allowed Blessing to follow the Maxima at a high speed so long as he showed "due regard for the safety of all persons and property." For the reasons stated above, and as the Dashcam Video makes clear, no reasonable juror could conclude that Blessing did not display such due regard.

### 3. *Other pending motions*

On May 29, 2019, Albarran made a motion for a more definite statement pursuant to Fed. R. Civ. P. 12(e) in which she asks the Defendants to elaborate on their first and third affirmative defenses, which regard Albarran's contributory negligence and her failure to mitigate damages. *See* Mot. for More Definite Stmnt., Doc. No. 42. Under Fed. R. Civ. P. 12(e), "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." "A motion for a more definite statement is not intended as a substitute for the normal discovery process." *See Allstate Ins. Co. v. Seigel*, 312 F. Supp. 2d 260, 277 (D. Conn. 2004).

Here, there is no response that Albarran is required to—or has even requested to—make to the Defendants' affirmative defenses. *See* Fed. R. Civ. P. 7(a). In any event, I have not relied on either of those affirmative defenses in this ruling. Thus, Albarran's motion for a more definite statement, doc. no. 42, is **denied as moot**.

Also on May 29, 2019, Albarran made a motion to strike pursuant to Fed. R. Civ. P. 12(f) in which she asks me to strike the Defendants' fifth, seventh, twelfth, seventeenth, and eighteenth affirmative defenses. *See* Mot. to Strike, Doc. No. 41. Motions to strike affirmative defenses are generally disfavored. *See Federal Housing Agency v. Royal Bank of Scotland Grp. PLC*, 204 F. Supp. 3d 426, 428 (D. Conn. 2016) (citing *William Z. Salcer, Panfeld, Edelman v. Envicon Equities Corp.*, 744 F.2d 935, 939 (2d Cir. 1984), *cert. granted, judgment vacated on*

*other grounds*, 478 U.S. 1015 (1986)).  For a plaintiff to prevail on a motion to strike an affirmative defense: "(1) there must be no question of fact that might allow the defense to succeed; (2) there must be no substantial question of law that might allow the defense to succeed; and (3) the plaintiff must be prejudiced by the inclusion of the defense."  *Coach, Inc. v. Kmart Corps.*, 756 F. Supp. 2d 421, 425 (S.D.N.Y. 2010) (internal citation and quotation marks omitted).

The only relevant portion of Albarran's motion regards her motion to strike the Defendants' fifth affirmative defense, which asserts that the "Defendants were not the proximate cause" of Albarran's injuries, which were, rather "the result of her own actions, the actions of other and/or superseding intervention of causes outside the control of Defendants."  *See* Mot. to Strike, Doc. No. 41, at 1.  Apparently, Albarran objects to any "superseding intervention" analysis because it is "fundamentally a proximate cause analysis."  Mem. in Supp. Mot. to Strike, Doc. No. 41-1, at 2 (citing *Barry v. Quality Steel Products, Inc.*, 263 Conn. 424, 436 (2003)).  I have not considered "superseding cause" doctrine in this ruling, and so Albarran has not been prejudiced by the inclusion of the defense.  Albarran's motion to strike the Defendants' seventh, twelfth, seventeenth, and eighteenth affirmative defenses similarly address issues that I have not considered.  Thus, Albarran's motion to strike, doc. no. 41, is **denied as moot**.

## IV.    Conclusion

For the foregoing reasons, I **grant** the Defendants' motion for summary judgment, doc. no. 38.  I hold that no reasonable juror could find that Blessing was negligent, and so he is entitled to summary judgment on count one.  Because Blessing was not negligent, he was by definition not reckless, and so he is also entitled to summary judgment on count two, which charges Blessing with reckless disregard for the safety of others.  Because Blessing was neither

negligent nor reckless, the County and the Department are entitled to summary judgment on counts three and four, which allege vicarious liability for Blessing's negligence and recklessness, respectively.  Finally, in her fifth count, Albarran alleges negligence directly against the Department and the County because the Department's dispatcher failed to instruct Blessing to stop the pursuit and also for failure to properly train Blessing.  *See* Am. Compl., Doc. No. 36, at ¶ 20.  The record is devoid of any facts regarding that claim, and so the Department and County are entitled to summary judgment on count five.  The clerk shall enter judgment for the Defendants and close the case.

        So ordered.

Dated at Bridgeport, Connecticut, this 11th day of March 2020.

                                                    /s/ STEFAN R. UNDERHILL
                                                    Stefan R. Underhill
                                                    United States District Judge